CHERYL R. KRICSFELD, APPELLANT AND CROSS-APPELLEE, V.
BARRY L. KRICSFELD, APPELLEE AND CROSS-APPELLANT.
588 N.W.2d 210

Filed January 5, 1999.   No. A-97-720.

David A. Domina, of Domina Law, P.C., for appellant.

Steven J. Lustgarten and Patrick A. Campagna, of Lustgarten
& Roberts, P.C., for appellee.

IRWIN, Chief Judge, and SIEVERS and MUES, Judges.

MUES, Judge.

## I. INTRODUCTION

Cheryl R. Kricsfeld appeals from the order of the Douglas County District Court modifying a decree of dissolution. Barry L. Kricsfeld has cross-appealed. For the reasons set forth below, we affirm in part, and in part reverse.

## II. BACKGROUND

On November 22, 1995, Cheryl, born September 18, 1948, filed a petition for dissolution of her 27-year marriage to Barry, born January 25, 1946. Trial was held December 4 and 5, 1996, and the following evidence was adduced: Barry and Cheryl were married on December 22, 1968. Three children were born of the marriage: Alan, born August 21, 1972; David, born November 15, 1975; and Michael, born January 7, 1979. At the time of the marriage, Barry and Cheryl were both students. Cheryl was in her junior year of college, and Barry was in graduate school and had applied to medical school. Barry was accepted into medical school in 1969.

Cheryl obtained her teaching certificate in the spring of 1970 and immediately began teaching full time. Cheryl worked for 2½ years, until she became pregnant with Alan. During this time, Barry's parents continued to pay his educational expenses, and both Barry's and Cheryl's parents assisted with the couple's living expenses until after Barry finished his residency in 1976.

In 1976, Barry began working with a Dr. Collignan at Diagnostic and Internal Medicine Associates (D.I.M.A.), a professional corporation. When Collignan retired in 1979, Barry "bought him out" and acquired 100 percent of the corporate stock. Dr. Stephen Nelson joined Barry in 1982, and they practiced together until Nelson's death in 1993, at which time Barry "had to buy out [Nelson's] portion [of D.I.M.A.] and pay it to his estate." Later that same year, Barry acquired the practice of another physician, Dr. James Knott, for approximately $50,000 to $55,000.

Dr. Evelyn Reher joined Barry in 1994. Reher's employment contract provided that on July 31, 1996, Reher would be eligible to purchase 50 percent of D.I.M.A.'s outstanding shares for

$5,000. The contract further provided that if Reher chose to exercise this option, she would have to pay Barry a management fee of $30,000 a year for 4 years. If Reher left D.I.M.A. for any reason, she was obligated to sell the stock back to Barry for $5,000 plus "a sum equal to the product of the number of full months worked over forty-eight (48) times forty percent (40%) of the accounts receivable of [D.I.M.A.]" Barry testified that the stock purchase option was currently available to Reher; however, she had been advised by her attorney not to exercise that option until after the divorce proceedings between Barry and Cheryl were completed.

Wendell Quist, a certified public accountant testifying on Barry's behalf, opined that D.I.M.A. had a fair market value of $61,094. Reed Samson, a certified public accountant testifying on Cheryl's behalf, opined that D.I.M.A. had a fair market value of $352,000. At the time of trial, Barry was grossing between $29,000 and $32,000 a month and estimated that his net income was approximately $18,259.89.

In 1990, Cheryl began working part time as a substitute teacher. Cheryl testified that she could not work full time until she got recertified. According to Cheryl, she needed to complete 16 hours of course study to get her recertification. As of the time of trial, Cheryl had completed 4 of the 16 hours. Cheryl expected to complete her studies in January or June 1998 and stated that the beginning salary for teachers in District 66 was $21,000. Cheryl testified that she would also like to get her master's degree, which would require an additional 20 hours of study. Prior to resuming teaching, Cheryl had devoted her attentions to nurturing her children and performing volunteer work for various civic organizations.

In the May 16, 1997, decree, the trial court determined that Barry had a gross yearly income of $372,000 and a net monthly income of $17,196.23 and that Cheryl had an annual gross earning capacity of $10,400 with a net monthly earning capacity of approximately $762.49 based upon a wage of $5 per hour. The court ordered Barry to pay alimony in the amount of $6,000 a month until Cheryl reaches age 65, dies, or remarries, whichever occurs first. At the time of trial, Cheryl was 48 years of age and Barry was 50 years old.

The court determined that the value of D.I.M.A. was $352,000 and awarded it all to Barry. The court further ordered that certain personal property be divided among the parties. The distribution and valuation of the personal property is not challenged by the parties. Utilizing the values determined by the court, Cheryl received total net property of $640,572.77 and Barry received net property of $909,260.44. In order to equalize the property award, the court ordered Barry to pay Cheryl $134,343.84. The court further ordered that the family residence and certain items of personal property not specifically awarded to either party be sold and that the proceeds be applied toward various debts of the parties. Any proceeds remaining after the debts had been paid were to be divided equally between the parties.

The court ordered Barry to pay Cheryl $18,853.21 in attorney fees and other costs. Because of the contentiousness of the parties, the court had appointed a guardian ad litem for Michael, even though he was nearly 18 years old at the time of trial. The court ordered that the parties each pay 50 percent of the guardian ad litem fees. The parties' agreement on joint custody was approved by the court, and Cheryl was awarded $2,350 a month in child support.

Barry filed a motion for new trial, and a hearing was held June 10, 1997. After hearing arguments of the parties, the court modified the original award of alimony to provide, inter alia, that commencing on the first day of the month after the personal property is sold and the closing of the house sale, the following alimony amounts would be payable: $6,000 per month for 36 months, then $5,000 per month for the next 36 months, then $4,000 per month for the next 60 months; and then $3,000 per month for the next 72 months. The court provided that all alimony would continue until Cheryl reaches age 65, dies, or remarries, whichever occurs first, and "said alimony shall not terminate upon the death of [Barry]." Cheryl's notice of appeal was filed July 8, 1997, and Barry has cross-appealed. After the notice of appeal was filed, several motions were presented to the trial court by Barry, which will be discussed later as necessary to our opinion.

### III. ASSIGNMENTS OF ERROR

Cheryl's four assignments of error are condensed for discussion to be: The trial court erred (1) in awarding inadequate alimony and in injecting fault into the decision, (2) in awarding inadequate temporary alimony, and (3) in ruling on certain motions after the appeal had been filed.

Barry cross-appeals, assigning as error that the trial court erred in the amount and term of alimony, in the valuation of D.I.M.A., and by not granting relief sought by him after the notice of appeal was filed.

### IV. STANDARD OF REVIEW

In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations regarding division of property, alimony, and attorney fees. *Davidson v. Davidson*, 254 Neb. 656, 578 N.W.2d 848 (1998). See *Priest v. Priest*, 251 Neb. 76, 554 N.W.2d 792 (1996).

With respect to questions of law, an appellate court has an obligation to reach a conclusion independent of the determination made by the court below. See *Hoshor v. Hoshor*, 254 Neb. 743, 580 N.W.2d 516 (1998).

### V. DISCUSSION

#### 1. TEMPORARY SUPPORT ORDER

Cheryl argues that the trial court awarded an inadequate amount of temporary support which forced her to borrow money while she was awaiting trial. Cheryl asks this court to find that she should have been awarded temporary alimony of $5,000 a month and requests that we retroactively order Barry to pay the difference between this amount and the amount awarded for the period the matter was pending.

Our record contains a temporary order dated February 12, 1996, which reflects that Cheryl was awarded $1,000 a month in child support. Barry was ordered to pay the "family expenses set forth in [Barry's] Affidavit dated December 13, 1995," which affidavit does not appear in our record, and "[Barry] shall apply all excess net monthly income, all bonus income, all fed-

eral and state income tax refunds, and any other income he may acquire to the debts of the parties set forth in [Barry's] Affidavit dated December 13, 1995 . . . ."

On March 28, 1996, Cheryl filed a motion for additional temporary support. At the hearing held April 16, the court awarded Cheryl $1,000 a month in temporary alimony. The court ordered Barry to pay the necessary repairs and maintenance for the family home, including the pool. In addition, he was ordered to pay house-cleaning expenses up to a maximum of $200 a month. The court held that Barry was relieved of the responsibility for paying Cheryl's telephone bill. The court noted that Barry had reduced the marital debt by $25,000, presumably from the date the petition for divorce was filed, November 22, 1995. The court held that except for the adjustments noted above, the provisions of the February 12, 1996, order were to remain in full force and effect. At the end of the hearing, counsel for Cheryl stated, "We have no objections to the order as proposed, Your Honor. We'll do our best to live with it."

An exhibit offered at trial indicated that Barry was paying $11,446 a month pursuant to the court's temporary order. Barry's payments included such items as the mortgage and taxes on the house; life and disability insurance; house repair and lawn service; utilities; Cheryl and Michael's automobile payments, maintenance, taxes, and insurance; health insurance; and temporary alimony and child support. Another exhibit offered at trial indicated that in addition to these expenses, Barry was paying approximately $3,025 a month toward credit card payments and other marital debts.

We find no abuse of discretion in the trial court's failure to award Cheryl a greater amount of temporary alimony. As best as we can determine, Cheryl was living in the family residence with all of her living expenses paid by Barry except her telephone, food, clothing, car fuel, and entertainment. Cheryl was awarded $2,000 a month in which to pay these expenses for herself and Michael. There is no evidence in the record which suggests that $2,000 a month was inadequate to cover these expenses. In short, we fail to see how Cheryl was "forced to . . . endure dramatic financial distress." Brief for appellant at 23. Moreover, we can find nothing in our record to indicate that

Cheryl ever requested a modification after the April 16, 1996, hearing.

Cheryl seems to contend that, inter alia, she was not allowed adequate pretrial suit money, including that necessary to retain expert witnesses. Cheryl has not assigned this as error, and accordingly, we will not address this issue. See *Myers v. Nebraska Equal Opp. Comm.*, 255 Neb. 156, 582 N.W.2d 362 (1998) (holding that errors which are argued but not assigned will not be considered by appellate court). We note, however, that on June 18, 1996, Cheryl filed a motion requesting that Barry be ordered to pay certain expert witness fees. The trial court's docket sheet indicates that on June 27, the court ordered that $3,000 of the parties' income tax refund "be placed in [Cheryl's] counsel's trust acct to be disbursed by him for expert fees." Our record does not reflect that any subsequent motions were filed requesting additional expert witness fees.

## 2. ALIMONY

### (a) Injection of Fault

Cheryl argues that the trial court erred in awarding an inadequate amount of alimony. As part of this overall argument, she contends that the trial court erroneously reduced the original award of alimony based on her "fault" of being unable to manage money. Brief for appellant at 19.

At the hearing on the motion for new trial, the trial court stated that its original award of alimony "gave too much emphasis to an incomplete record on [Cheryl's] possible inability to manage her own finances, and . . . frankly, [the court] just thought that [Barry's] income was such that he could pay the freight."

Contrary to Cheryl's contention that the trial court erroneously injected fault into the decision to reduce alimony, we read these comments to mean just the opposite. It seems obvious, in context, that the court felt it had originally awarded Cheryl *more* alimony because of the perception, unsupported by any real evidence, that Cheryl was a spendthrift or was unable to manage money wisely. After reconsideration, the court felt that it had been wrong to base alimony on this unsupported premise and to make Barry pay a greater amount of alimony as

a result. A trial court has discretionary inherent power to vacate or modify its judgment anytime during the term in which the judgment was rendered. *Manske v. Manske*, 246 Neb. 314, 518 N.W.2d 144 (1994). We believe that the trial court's ultimate alimony award is subject to the same standard of review as the award made originally. The ultimate test for determining correctness in the amount of alimony is reasonableness, and the trial court's determination will normally be affirmed in the absence of an abuse of discretion. *Kelly v. Kelly*, 246 Neb. 55, 516 N.W.2d 612 (1994). In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. *Id.* In the following discussion, our reference to the "alimony award" is to the one entered upon Barry's motion for new trial.

(b) Was Alimony Award Abuse of Discretion?

The trial court determined that Barry had a gross annual income of $372,000 and a net monthly income of $17,196.23. Neither party challenges these figures.

Cheryl was awarded $494,552.61 of Barry's profit-sharing plan and additional personal property valued at $146,020.16. Cheryl claims the alimony award is inadequate to meet her monthly needs, which she estimated at trial to be approximately $6,140. Barry assigns as error the duration of the alimony award. Citing *Kelly v. Kelly, supra*, Cheryl argues that she should have been awarded 25 percent of Barry's *gross* monthly income or $7,750. Contrary to Cheryl's assertions, the Supreme Court in *Kelly* did not award the wife 25 percent of the husband's approximate gross annual income of $100,000. Rather, it appears to have been closer to 25 percent of the husband's *net* income. More importantly, alimony must be determined by the facts of each case. See *Kelly v. Kelly, supra*.

■ In dividing property upon a dissolution of marriage and in determining alimony, a court should consider four factors: (1) the circumstances of the parties; (2) the duration of the marriage; (3) the history of contributions to the marriage, including contributions to the care and education of the children and interruption of personal careers or educational opportunities; and (4)

the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. *Davidson v. Davidson*, 254 Neb. 656, 578 N.W.2d 848 (1998); Neb. Rev. Stat. § 42-365 (Reissue 1993). In awarding alimony, a court should consider, in addition to the specific criteria listed in § 42-365, the income and earning capacity of each party as well as the general equities of each situation. *Ainslie v. Ainslie*, 249 Neb. 656, 545 N.W.2d 90 (1996); *Kelly v. Kelly, supra.*

Michael reached the age of majority in January 1998, so child support and child care is not a significant factor for either Cheryl or Barry. While Cheryl interrupted her teaching career to raise the family, she anticipated obtaining her teaching recertification in January or June 1998. If Cheryl obtains a teaching position after receiving her recertification, she will be grossing approximately $21,000 a year, according to the trial testimony.

The divorce jurisprudence of this state has never viewed the purpose of alimony to be the equalization of the parties' incomes. See *Reichert v. Reichert*, 246 Neb. 31, 516 N.W.2d 600 (1994). However, disparity in income or potential income may partially justify an award of alimony. *Thiltges v. Thiltges*, 247 Neb. 371, 527 N.W.2d 853 (1995).

We conclude that the court's alimony award was not an abuse of discretion in either amount or duration. Therefore, Cheryl's assignment of error, as well as Barry's, is without merit.

### 3. POSTAPPEAL MOTIONS

#### (a) Cheryl's Assignment of Error

Cheryl's final assignment of error is that the trial court erred "when it ruled on motions" filed by Barry after the appeal had been filed by Cheryl. Cheryl argues that Neb. Rev. Stat. § 42-351 (Supp. 1997) limits a trial court's jurisdiction after an appeal has been taken and that the trial court in this case ignored these limitations.

Cheryl asks for an appropriate award of attorney fees for the services of her attorney in connection with these motions. As couched, Cheryl's assignment of error does not specifically assign error in the failure of the trial court to award her attorney fees for these pretrial motions. Errors argued but not assigned

will not be considered on appeal. *Myers v. Nebraska Equal Opp. Comm.*, 255 Neb. 156, 582 N.W.2d 362 (1998). Moreover, Cheryl cites us to no authority for the proposition that this court is empowered to grant her attorney fees for services rendered in the trial court absent a request for such first being made in that court. As a general proposition, absent plain error, a lower court cannot commit error in resolving an issue never presented and submitted to it for disposition. See *Jirkovsky v. Jirkovsky*, 247 Neb. 141, 525 N.W.2d 615 (1995). From what we can determine from the record before us, Cheryl did not present the issue of attorney fees on these motions to the trial court.

While Cheryl alleges error in the court's ruling on Barry's posttrial motions, she did not present us with a bill of exceptions from the hearings on said motions. Consequently, we are unable to address the merits of the trial court's rulings. We take Cheryl's arguments to be that the court lacked jurisdiction to even entertain these motions and that, consequently, all orders entered pursuant to them should be vacated as void.

Cheryl points to four different motions filed by Barry. Cheryl's notice of appeal was filed July 8, 1997. On the same date, Barry filed a motion to require the listing of the family residence; on July 15, Barry filed a motion for an order nunc pro tunc seeking to add an omitted creditor to the decree; on August 28, he filed a motion for clarification regarding the contribution of each party toward the guardian ad litem fees; and on September 4, Barry filed a motion to reduce the listing price of the house and to require Cheryl to account for child support payments made to her.

■ Generally, once an appeal has been perfected, the trial court has no jurisdiction to determine any issues regarding the subject matter of the litigation. See *McLaughlin v. Hellbusch*, 251 Neb. 389, 557 N.W.2d 657 (1997).

> When final orders relating to proceedings governed by sections 42-347 to 42-381 are on appeal and such appeal is pending, the court that issued such orders shall retain jurisdiction to provide for such orders regarding custody, visitation, or support or other appropriate orders in aid of the appeal process.

§ 42-351(2).

If a supersedeas bond has not been filed, the court retains jurisdiction to enforce the terms of the judgment. See, e.g., *Kula v. Kula*, 180 Neb. 893, 146 N.W.2d 384 (1966). Our record does not reflect that Cheryl filed a supersedeas bond.

Barry's motion requesting the court to order that the house be listed for sale and his motion for an order requiring a reduction in the listing price of the residence stem from a provision in the original decree that the residence be sold and a provision in the modified decree ordering that "the family residence, currently occupied by [Cheryl] and the minor child of the parties hereto, shall be listed for sale on Wednesday, June 11, 1997, and shall be sold as expeditiously as possible . . . ." In *Kula*, after the wife appealed a divorce decree, the husband filed a motion directly with the Supreme Court seeking an order requiring the wife to surrender possession of a dwelling in accordance with the divorce decree. The Supreme Court held: "Although the case is now pending on appeal in this court, no supersedeas was filed. The appeal, therefore, does not operate as a stay of proceedings. The district court has jurisdiction and may enforce the award as in the case of any other nonsuperseded judgment." 180 Neb. at 893, 146 N.W.2d at 384.

Under the authority of *Kula*, because Cheryl failed to file a supersedeas bond, the lower court has jurisdiction to enforce the award, which included the listing and sale of the residence. Consequently, the trial court had jurisdiction to hear these motions.

Two of Barry's motions resulted in orders nunc pro tunc. The first resulted from a motion seeking inclusion in the list of debts that were to be paid from the sale of the marital residence a debt to First National Bank. Barry alleged that in the court's opinion letter, this debt was referenced but was "through inadvertence and mistake" omitted from the decree. The court's opinion letter is not in evidence, and since we are not addressing the granting of this motion on its merits, its absence is of no consequence. The lower court granted this motion.

The Nebraska Supreme Court has held that a court may properly consider a motion for an order nunc pro tunc even after an appeal has been perfected. *Samardick of Grand Island-*

*Hastings, Inc. v. B.D.C. Corp.*, 183 Neb. 229, 159 N.W.2d 310 (1968). In that case, the court held:

> "An appeal or error proceeding, properly perfected, deprives the trial court of any power to amend or modify the record as to matters of substance, but the pendency of an appeal or writ of error ordinarily does not deprive the trial court of the power to correct its record so that it will truly set forth the proceedings as they actually occurred, even though the correction of the error deprives the appellant of his ground of appeal."

183 Neb. at 231-32, 159 N.W.2d at 313 (citing 4 Am. Jur. 2d *Appeal and Error* § 354 (1962)). The trial court had jurisdiction to entertain Barry's motion for an order nunc pro tunc.

The second nunc pro tunc order related to the sharing of guardian ad litem fees. The decree provided that the parties would be equally responsible for such fees. According to Barry's August 28, 1997, motion, the trial court, on August 13, had entered an order reapportioning these fees in a different manner. While this August 13 order of the district court is not in our record, a September 18 docket sheet reflects that the trial court ordered "nunc pro tunc, that [the guardian ad litem] fees will be paid 50% each by [Cheryl] and [Barry]." Once again, we do not discuss the merits of this order. However, the decree did provide for an equal split on these fees. As discussed above, once the notice of appeal was filed, the trial court retained jurisdiction to issue those orders necessary to enforce the provisions of the decree, *Kula v. Kula*, 180 Neb. 893, 146 N.W.2d 384 (1966), or to correct the record to truly reflect the proceedings, *Samardick of Grand Island-Hastings, Inc. v. B.D.C. Corp., supra*, but it had no authority to modify the decree. Thus, the court's correcting its record to reflect the original guardian ad litem fee allocation, which is what the court's order of September 18 did, was within its authority.

The final motion of which Cheryl complains is Barry's motion requiring her to account for child support payments. Interestingly, the trial court's docket sheet reflects that this motion, along with Barry's motion to require the parties to reduce the listing price of the family residence, was overruled, "since Court lacks jurisdiction." As discussed, the court had

jurisdiction to address Barry's motion to reduce the listing price. Moreover, pursuant to § 42-351(2), we believe it had jurisdiction to hear a motion seeking an order "regarding . . . child support."

In sum, to the extent that Cheryl seeks a decision of this court vacating the orders entered in response to Barry's postappeal motions on the ground that the trial court lacked jurisdiction to enter them, her position is meritless.

### (b) Barry's Assignment of Error

Barry cross-appeals, alleging that the trial court erred in not granting his motion "in aid of the appeal process." Brief for appellee at 40. In context, he is apparently referring to the motion seeking a reduction in the listing price of the residence. Barry relies upon § 42-351(2) and, in particular, the language providing that the district court retains jurisdiction, in spite of an appeal, "to provide for . . . appropriate orders in aid of the appeal process."

We need not decide whether § 42-351(2) grants such authority to a district court, because as already discussed, we believe that *Kula v. Kula, supra,* is clear on the subject.

Barry argues that the trial court's ruling denied him a substantial right pending the outcome of this appeal. Certainly, the trial court's ruling erroneously denied him the right to present his motion and accompanying evidence on the issue. However, since that did not occur, and since there is no record for us to review, we are unable to review the issue of whether the trial court abused its discretion in not granting the motion. The extent of our authority on this appeal is to direct the district court, when the case is returned to it, to immediately address the motions of the parties regarding the sale of the residence so that it can be expeditiously sold as the decree contemplates.

### 4. Valuation of D.I.M.A.

The final issue presented by this appeal is whether the district court's determination that D.I.M.A. had a value of $352,000 was an abuse of discretion.

At trial, evidence was presented that in 1994, University Medical Associates (UMA) offered to purchase D.I.M.A. for $368,000. This offer consisted of paying $117,000 for the

receivables and hard assets, $106,000 for "intangibles," and $145,000 for a covenant not to compete. An internal memo noted that the "[s]ignificant fixed assets capitalized by [D.I.M.A.] include office furniture, leasehold improvements, and a computer system. [D.I.M.A.] appears to own very little medical equipment." The memo further indicated that it was anticipated that UMA would not assume a loan payable in the amount of $123,795, a note payable in the amount of $9,439, or a $26,000 note receivable. After adjusting for the assets and liabilities not assumed, the offer translated to approximately $260,766.

Barry also received an offer from Methodist Hospital in 1994. Methodist's offer was for $350,000. Barry wrote a note to himself next to this figure indicating that it was "not nearly enough." The offer included D.I.M.A.'s receivables, inventory, equipment, computer system and software, medical records, contracts, work force, "Etc." The offer excluded cash and/or investments at closing and liabilities and notes payable. Included in the offer was $175,000 for a covenant not to compete. When the liabilities are deducted from this offer, it translates to approximately $216,766. In addition, the proposal guaranteed Barry a continuing salary and benefit package totaling $263,000.

Barry testified that he did not seriously entertain either offer and did not know what the obligation would be on his part to remain with D.I.M.A., the number of hours he would have to work, or the number of patients he would have to see. Barry further testified that he did not negotiate the price with either party because he did not want to sell D.I.M.A.

Samson, a certified public accountant, was called to testify on behalf of Cheryl. Samson opined that the value of D.I.M.A. stocks was approximately $352,000. Samson arrived at this figure using a capitalized earning approach. Samson determined the net earnings for the past 4 years, weighted the averages of the net earnings, and then divided by a capitalization rate. To arrive at the net earnings figure, Samson adjusted compensation to "reflect the average MGMA physician compensation for high performing practices such as DIMA," excluded certain fringe benefits, and excluded any unusual earnings or expenses such as

the purchase or sale of equipment. Samson averred that valuing medical practices comprises approximately one-third of his practice and stated that he had used this same method in valuating other medical practices.

Samson testified that in valuing D.I.M.A., he also looked at Reher's contribution to D.I.M.A. He stated that this was important because it "embodies the principle that the practice has an excellent reputation, and the patient draw comes not only to the physician but the practice." Samson rejected the net asset approach because

> [a] professional practice has significant other elements — another element. And we can call it "goodwill", or we can call it "intangible value". . . .
>
> . . . [T]he practice itself has another element of value that is not reflected in either a book value or a net asset value approach. And it takes years to generate that type of loyal following of your patients.

During cross-examination, Samson acknowledged that his figures assumed that both Barry and Reher would be involved in D.I.M.A. for a period of 2 to 3 years after the acquisition. Samson was then asked whether he had included a value for goodwill in his estimate. He replied, "The value of the practice, based on cash flows, really embodies all elements of the value of the practice, which would include hard assets, receivables, goodwill, if there is any. It's really the earning power of the corporation . . . ." When asked what the value of D.I.M.A. would be if Barry and Reher were "not going to be part and parcel of the package," Samson was unable to express a value.

Barry relied upon Quist, a certified public accountant, to value D.I.M.A. Quist testified that he is friends with Barry and had prepared the Kricsfelds' personal income tax returns for the past 10 years. Quist has evaluated approximately 45 to 50 medical practices in his career and had always used the net asset approach. This method involves taking the value of the assets of the corporation and subtracting the liabilities of the corporation. Utilizing a balance sheet prepared by another accountant, and adjusting the equipment to what Quist believed was its fair market value, Quist determined that D.I.M.A. had assets of $264,517 and liabilities of $203,423 for a fair market value of

$61,094. Quist's values included intangibles of $150,000. Quist testified that the "[i]ntangible value would be inclusive of goodwill plus other items that would make that up, including the charts."

Quist explained that he never utilized the capitalized earnings approach because such an approach is based upon the net earnings of the physician. Thus,

> If, in a professional practice, income is only generated by the physician, then all of the net income of the corporation would be deemed to be that compensation for that particular physician. . . .
>
> Thus, if all of the net income is compensation, there is no remaining net earnings . . . that can be capitalized.

*Taylor v. Taylor*, 222 Neb. 721, 386 N.W.2d 851 (1986), also involved the valuation of a medical practice. Similar to the present case, two experts were called to express an opinion as to the value of the medical practice. The expert called on behalf of the wife utilized a capitalized earning approach and included the goodwill of the corporation, which included the " 'good name [of the physician], his capable staff and personnel, [and] his reputation for superior services.' " *Id.* at 724, 386 N.W.2d at 854. The wife's expert also testified that in order to realize the husband's valuation, he would have to remain for a period of time after the sale. The trial court rejected this value and accepted the husband's expert's valuation, which was based upon the tangible assets of the corporation.

In rejecting the wife's argument that goodwill should have been included in the valuation of the medical practice, the Nebraska Supreme Court stated:

> [I]f goodwill depends on the continued presence of a particular individual, such goodwill, by definition, is not a marketable asset distinct from the individual. Any value which attaches to the entity solely as a result of personal goodwill represents nothing more than probable future earning capacity, which, although relevant in determining alimony, *is not* a proper consideration in dividing marital property in a dissolution proceeding. . . . "There is a disturbing inequity in compelling a professional practitioner to pay a spouse a share of intangible assets at a judicially

determined value that could not be realized by a sale or another method of liquidating value."

Accordingly, to be properly within the purview of § 42-365 as property divisible and distributable in a dissolution proceeding, we conclude that goodwill must be a business asset with value independent of the presence or reputation of a particular individual, an asset which may be sold, transferred, conveyed, or pledged.

(Emphasis supplied.) 222 Neb. at 731, 386 N.W.2d at 858-59.

Samson admitted that his valuation of D.I.M.A. was based upon the continued presence of *both* Barry and Reher for 2 to 3 years after acquisition. Samson was unable to express an opinion as to the value of D.I.M.A. if Barry and Reher did not agree to remain for a period of time after acquisition. Although Samson did not necessarily express his opinion in terms of "goodwill," it is clear from the testimony outlined above that his valuation included the professional goodwill of Barry, the same type of goodwill which was emphatically rejected in *Taylor*. If we reject Samson's valuation of D.I.M.A., the only other evidence of current value is Quist's valuation which, at first blush, appears to be unreasonably low, particularly in light of the two offers Barry received in 1994. These offers weighed heavily in the trial court's decision.

In reaching its determination that D.I.M.A. should be valued at $352,000, the trial court found:

In the Fall of 1994, [Barry] was approached by both Methodist Hospital and the University of Nebraska Medical Center (UNMC) regarding the possibility of acquiring DIMA. Exhibit 99 is a study performed by Arthur Anderson & Co. for University Medical Associates (a part of UNMC) which lists under "Option I" a purchase price of $368,000. Although [Barry] labeled this "more of an ego booster" than a genuine offer, [Barry] did acknowledge that he provided information to Arthur Anderson to permit them to prepare Exhibit 99. Exhibit 100 was provided to [Barry] by Methodist Hospital and on page 3 states "PURCHASE PRICE = $350,000." Next to those words are [Barry's] handwritten words "not nearly enough." . . . [T]his Court finds, that these were arms-

length proposals from interested purchasers. They may not be dispositive of the value of DIMA at the time of trial, but they are highly instructive, particularly in light of the expert testimony described below.

As noted above, both the Methodist Hospital and UMA offers included amounts for covenants not to compete, the former being in the amount of $175,000 and the latter in the amount of $145,000. Nebraska has never before considered whether the value of a covenant not to compete in connection with a professional practice should be included as marital property. Many courts have held that the value of covenants not to compete are not marital property. See, e.g., *Lowe v. Lowe*, 372 N.W.2d 65 (Minn. App. 1985) (affirming trial court's conclusion that spouse should not benefit from valuation method that denies or restricts other spouse's future employment options); *Theilen v. Theilen*, 847 S.W.2d 116, 120 (Mo. App. 1992) (holding covenant not to compete should not be included in valuation of professional practice and observing, "Perhaps a reason for this rule is that no professional practitioner is required to give up his profession in order to be divorced"); *Ellerbe v. Ellerbe*, 323 S.C. 283, 473 S.E.2d 881 (1996) (holding covenant not to compete is not marital property); *Marriage of Monaghan*, 78 Wash. App. 918, 899 P.2d 841 (1995) (observing that covenant not to compete is separate property of covenantee because it restricts covenantee's future conduct). Courts which have included the value of covenants not to compete in the marital estate have generally done so on the theory that covenants not to compete are merely another form of goodwill which those courts, unlike *Taylor v. Taylor*, 222 Neb. 721, 386 N.W.2d 851 (1986), recognize as divisible marital property. See, e.g., *Carr v. Carr*, 108 Idaho 684, 701 P.2d 304 (Idaho App. 1985); *Reese v. Reese*, 671 N.E.2d 187 (Ind. App. 1996).

▇ The reasoning of the courts which have excluded covenants not to compete from the value of a professional practice are persuasive and consistent with the rationale of *Taylor*. *Taylor* teaches that any "asset" that does not have a value independent of the presence or reputation of a particular individual is not a marital asset. In that case, goodwill which was dependent on the continued presence of an individual was deemed not

to be a marital asset. Similarly, the value of a typical covenant prohibiting or restricting an individual from competing with another is, by definition, dependent upon the presence or reputation of the individual who gives the covenant. For example, if an individual loses his or her license to practice medicine, he or she ceases to be "present" in a competitive sense. Consequently, it is unlikely that any value would be paid to that person for a covenant not to compete, as he or she could not compete anyway. To the extent that the value of a covenant not to compete is solely dependent on the presence or reputation of an individual, it is not a marital asset. If the value of the covenants not to compete are excluded from Methodist Hospital's and UMA's offers, then the offers respectively translate to $66,766 and $85,766.

In sum, we believe that Samson's method of valuation and the offers of Methodist and UMA included elements of value disapproved of in *Taylor v. Taylor, supra,* and conclude that the trial court abused its discretion in its valuation of D.I.M.A. We find that the current value of D.I.M.A. based on the only other evidence in the record is $61,094. Utilizing our valuation of D.I.M.A. and the trial court's valuations of the remaining assets, Barry has received net assets worth $618,354.44 and Cheryl has received $640,572.77. Thus, the trial court's decree granting a judgment of $134,343.84 to equalize the division of property is modified to eliminate that judgment. While this division of property gives Cheryl a slightly greater amount of the property, we believe that under the circumstances, it is equitable without a judgment in favor of Barry to perfectly equalize it.

## VI. CONCLUSION

The trial court's award of alimony is not an abuse of discretion. The trial court abused its discretion in the valuation of D.I.M.A., and therefore the money judgment in favor of Cheryl to equalize the division of property is reversed. The decree is affirmed in all other respects. Each party shall bear his or her own attorney fees on appeal.

AFFIRMED IN PART, AND IN PART REVERSED.