IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

KEADY V. KEADY

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

JOHN K. KEADY, APPELLEE AND CROSS-APPELLANT,
V.
KATHY S. KEADY, APPELLANT AND CROSS-APPELLEE.

Filed September 9, 2014.    No. A-13-734.

Appeal from the District Court for Douglas County: LEIGH ANN RETELSDORF, Judge.
Affirmed.

Michael B. Lustgarten, of Lustgarten & Roberts, P.C., L.L.O., for appellant.

Benjamin M. Belmont, of Brodkey, Peebles, Belmont & Line, L.L.P., for appellee.

IRWIN, MOORE, and PIRTLE, Judges.

IRWIN, Judge.

## I. INTRODUCTION

Kathy S. Keady appeals a decree of the district court for Douglas County, Nebraska, dissolving her marriage to John K. Keady. On appeal, Kathy challenges the court's award of alimony, valuation of John's interest in a company, and award of attorney fees. John cross-appeals, challenging the court's failure to award him a credit for mortgage payments made until the sale of the parties' residence. We find no merit to the parties' assertions, and we affirm.

## II. BACKGROUND

Kathy and John were married in 1982. In November 2011, John filed a complaint seeking dissolution of the marriage. Kathy requested alimony in her answer.

In May 2012, the district court entered a temporary order. The court awarded Kathy possession of the parties' home and ordered John to continue paying the mortgage on the property. The court also awarded Kathy $4,250 per month in temporary alimony.

- 1 -

At the time of trial, John was 55 years old. He was employed as president of Tiburon Financial, LLC (Tiburon), a third-party collection agency co-owned by John and one partner. John has a 50-percent ownership interest in Tiburon.

John testified that when the parties were married, he had been employed at General Motors Acceptance Corporation earning a salary of approximately $29,000 per year. Tiburon was founded in 2000. At Tiburon, John's monthly cashflow included both a salary and distribution payments taken from Tiburon's earnings.

In 2008, Tiburon purchased another collection company for $2.3 million in a fully leveraged deal. Soon after the purchase, Tiburon lost two of the purchased company's most profitable clients. The increased debt associated with this purchase, as well as a general economic downturn, impacted Tiburon's profitability. One of Tiburon's largest existing clients moved a significant portion of its business in house and additionally pulled back a number of collection accounts as part of a legal action by attorney generals in a number of states concerning financial collections.

In 2012, John took distribution payments comprising retained earnings from prior years. In 2012, Tiburon did not make a profit, and by the time of trial, Tiburon's retained earnings from prior years had been depleted. An attorney who does tax work for Tiburon testified that by the time of trial, he believed that Tiburon's retained earnings from prior years "is zero." As a result, moving forward, John would no longer be able to supplement his salary with disbursements.

In addition, in 2012, John and his partner both took "loans" from their retirement accounts in the amount of $50,000 each and injected the $100,000 total into Tiburon so there was cash available for disbursements in 2012. They were required to stop matching deposits for employee 401K accounts and cut bonuses for management and support staff. John testified that in addition, he had been forced to reduce his own salary from $90,000 per year to $3,400 per month.

Evidence adduced at trial demonstrated that for the several years prior to trial, John's average monthly cashflow had been approximately $13,500 per month. In 2012, however, John's estimated monthly cashflow was approximately $9,290 per month. The tax attorney who testified on John's behalf testified that John's estimated gross monthly cashflow in 2013, assuming that Tiburon's performance was comparable to that in 2012, was expected to decrease to approximately $8,500 to $9,000 per month, with a net of approximately $6,250 per month.

At the time of trial, Kathy was 55 years of age. Kathy was employed outside of the home early in the parties' marriage, but had not been employed full time since 1987. She was employed part time through 1997, but primarily stayed at home during the marriage to care for the parties' children. Evidence at trial indicates that the highest wage Kathy had ever earned was $11 per hour. At the time of trial, she was a kitchen helper at a high school for 2 to 3 hours per week, 3 weeks a month, earning approximately $650 annually.

Kathy testified that she had quit nursing school to raise the family, but did plan to work in the future. She testified that the parties attempted to reconcile for the first 3 years after they separated and that she had not sought employment during that time because she had hopes the parties would succeed in reconciliation. She acknowledged that she had not sought further employment after John filed for dissolution of the marriage.

The primary marital asset at issue in this case is John's 50-percent interest in Tiburon. John presented evidence from a certified public accountant concerning an appropriate valuation of John's interest in Tiburon. The accountant presented testimony about different methods of valuation of a business, including an asset-based approach, a market approach, and an income approach. He testified about industry standards related to each approach and testified that he had conducted a valuation in this case consistent with those standards.

In this case, the accountant testified that he conducted an asset-based approach and an income approach to value John's interest in Tiburon. He testified that a market approach would normally be the best approach, but that when attempting to value closely held companies like Tiburon, it is very difficult to find similar businesses to compare. In this case, he testified that he had been unable to locate any comparable businesses to compare Tiburon to, making the market approach unfeasible.

The accountant testified that the 2008 purchase of the other collection company had resulted in a significant increase in Tiburon's debt and that the loss of accounts afterward had impacted Tiburon's revenue. He testified that there were no key assets which could be liquidated and that, under an asset-based approach, Tiburon would have a negative valuation. He testified that he rejected the asset-based approach because Tiburon does have a long-term history, an organized workforce, and intangible and goodwill assets that have value.

The accountant testified that he determined that an income approach was the best way to value John's interest in Tiburon. Based on discounted future cashflow, a historic decline in "sales growth," and projections going forward, the accountant opined that the fair market value of John's interest in Tiburon, using the income approach, was $96,945.

There was also evidence adduced at trial concerning a "Buy-Sell" agreement executed by Keady and the other co-owner of Tiburon in 2004. The agreement provided "for the purchase by each Member of the other's ownership interest . . . upon the death, disability, retirement or withdrawal of any Member." The agreement provided that, as of the date of execution in 2004, each owner's interest in Tiburon was valued at $1.5 million. The paragraph of the agreement indicating the then-established valuations also included language indicating that the valuation "may be changed from time to time by the [members] by endorsement" and indicated that "if the [members] neglect to re-evaluate [Tiburon] for a period in excess of two years, [Tiburon's] Independent Appraiser is directed to apply the same valuation procedure, measuring adjusted asset values and Goodwill as of the last day of the month preceding the death, retirement or withdrawal."

The accountant who valued John's interest in Tiburon at $96,945 testified that he did not factor the buy-sell agreement into his valuation. He testified that he was not aware of whether any revaluation had been done for the buy-sell agreement since its execution in 2004, but testified that as of trial the value under the buy-sell agreement "would be negative."

Kathy testified that she did not engage an appraisal of Tiburon. She testified that she believed that the buy-sell agreement required Tiburon to pay $1.5 million for John's interest if he elected to leave the company. She acknowledged, however, that the agreement was dated 2004, provided that value should be reevaluated after 2 years, and that no revaluation had been done.

In May 2012, the district court entered a temporary order granting possession of the parties' marital residence to Kathy and ordering John to continue paying the monthly mortgage

payment associated with the residence. At trial, Kathy testified that she desired to have the residence sold. Kathy asked that the sale not occur for 6 months after the entry of the decree, to allow her to document receipt of alimony for a sufficient period of time to qualify for a home loan from a mortgage lender.

In April 2013, the district court entered an order dissolving the parties' marriage. The court awarded Kathy alimony in the amount of $4,000 per month for a period of 6 months and thereafter $3,300 per month for a period of 114 months.

The court ordered the parties' marital residence "be placed on the market within 30 days from the date the final Decree [was] filed." The court ordered John responsible for the monthly mortgage payment, real estate taxes, and insurance until the residence is sold, and ordered that the "net proceeds or losses from the sale" be divided equally between the parties.

The court divided the parties' property. Relevant to the appeal, the court valued John's interest in Tiburon at $96,945 and awarded John the entirety of his interest in the company, subject to any debt owed thereon. The court also awarded Kathy $31,460 to equalize the division of the marital estate.

The court concluded that Kathy had demonstrated that she had incurred almost $19,000 in attorney fees and costs. The court ordered John to pay $12,000 toward those fees and costs.

This appeal followed.

## III. ASSIGNMENTS OF ERROR

On appeal, Kathy has assigned three errors. First, she asserts that the district court erred in awarding her an insufficient alimony award. Second, she asserts that the court erred in its valuation of John's interest in Tiburon. Third, she asserts that the court erred in awarding her an insufficient amount for attorney fees.

On cross-appeal, John asserts that the district court erred in not ordering that he is entitled to a credit for the mortgage payments made until the parties' residence is sold.

## IV. ANALYSIS

### 1. KATHY'S APPEAL

#### (a) Alimony

Kathy first challenges the district court's alimony award. She argues that the court awarded her an amount of alimony that is insufficient both in its monthly amount and in its duration. We find no abuse of discretion upon our de novo review.

In an action for dissolution of marriage, an appellate court reviews de novo on the record the trial court's determination of alimony; a determination regarding alimony, however, is initially entrusted to the trial court's discretion and will normally be affirmed in the absence of an abuse of that discretion. *Becker v. Becker*, 20 Neb. App. 922, 834 N.W.2d 620 (2013). A judicial abuse of discretion requires that the reasons or rulings of a trial judge be clearly untenable, unfairly depriving a litigant of a substantial right and a just result. *Id.*

Neb. Rev. Stat. § 42-365 (Reissue 2008) provides:

> When dissolution of a marriage is decreed, the court may order payment of such alimony by one party to the other . . . as may be reasonable, having regard for the

circumstances of the parties, duration of the marriage, a history of the contributions to the marriage by each party, including contributions to the care and education of the children, and interruption of personal careers or educational opportunities, and the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of such party.

In addition to the criteria listed in § 42-365, in considering alimony upon a dissolution of marriage, a trial court is to consider the income and earning capacity of each party, as well as the general equities of each situation. *Becker v. Becker, supra*. In determining whether alimony should be awarded, in what amount, and over what period of time, the ultimate criterion is one of reasonableness. *Id.* The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. *Id.* Disparity in income or potential income may partially justify an award of alimony. *Id.*

In the decree, the trial court specifically recognized the various factors relevant to an alimony determination. The court recognized that the marriage was of long duration, that Kathy was the primary caregiver for the parties' children, and that John advanced his business interests throughout the marriage. The court recognized that Kathy forwent a career to raise the parties' children, while John's employment opportunities and income were significantly advanced during the marriage. The court specifically recognized the impact on John's earnings from the economic downturn, and also evidence that a significant amount of Tiburon's debt had been decreased and would be extinguished in the near future. The court noted that there was evidence to be optimistic about John's future cashflow. The court also concluded that Kathy was capable of obtaining employment, particularly now that there are no minor children remaining at home, but that she has also been out of the workforce for a substantial period of time. The court considered all of these factors, as well as evidence concerning the parties' monthly expenses.

After considering all of these factors, the court concluded that Kathy was entitled to alimony in the amount of $4,000 per month for a period of 6 months and then $3,300 per month for a period of 114 months. In light of our de novo review of the record, we cannot say that this award is clearly untenable, unfairly depriving Kathy of a substantial right and a just result. The award is not an abuse of discretion.

In her brief on appeal, Kathy cites this court to the decision in *Kricsfeld v. Kricsfeld*, 8 Neb. App. 1, 588 N.W.2d 210 (1999), and *Titus v. Titus*, 19 Neb. App. 751, 811 N.W.2d 319 (2012), in support of her argument that the alimony award in the present case was insufficient. She argues factual similarities between the present case and those cases with regard to the duration of the marriage and disparities of income. In *Kricsfeld v. Kricsfeld, supra*, the trial court awarded alimony in the amount of $6,000 per month for 36 months, then $5,000 per month for 36 months, then $4,000 per month for 60 months, and then $3,000 per month for 72 months. In *Titus v. Titus, supra*, the trial court awarded alimony in the amount of $15,000 per month for 120 months, and then $7,500 per month for 24 months. Kathy argues that these cases, "with many similar facts to the case before this court, included substantially higher amounts and longer durations of alimony" than the alimony award in the present case. Brief for appellant at 13.

In reviewing a trial court's award of alimony, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result.

*Becker v. Becker*, 20 Neb. App. 922, 834 N.W.2d 620 (2013). One crucial common thread in this court's decisions in *Kricsfeld v. Kricsfeld, supra*, and *Titus v. Titus, supra*, as well as other decisions cited by Kathy, such as *Finley-Swanson v. Swanson*, 20 Neb. App. 316, 823 N.W.2d 697 (2012), is that they reflect a determination that on the entire factual record of the case, the trial court's alimony award was not untenable such as to deprive a party of a substantial right or just result. Those cases do not stand for the notion that an award of a lesser amount in a case with a marriage of long duration and with disparity of income between the parties will be untenable.

On our de novo review of the record in the present case, we do not find the district court's alimony award to be an abuse of discretion. The award of $4,000 for 6 months and then $3,300 per month for 114 months does not deprive Kathy of a substantial right or a just result, when viewed in light of the entire factual context presented in this record. Kathy's assignment of error to the contrary is without merit.

(b) Valuation of Interest in Company

Kathy next challenges the district court's valuation of John's interest in Tiburon. She argues that the opinion of John's expert concerning the value should have been rejected and that her evidence demonstrated that the interest in Tiburon should be valued more highly than John's expert suggested. We find these assertions to be meritless.

Under § 42-365, the equitable division of property is a three-step process. The first step is to classify the parties' property as marital or nonmarital. The second step is to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *Bussell v. Bussell*, 21 Neb. App. 280, 837 N.W.2d 840 (2013). The ultimate test in determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case. *Id.*

The division of property is a matter entrusted to the discretion of the trial judge, which will be reviewed de novo on the record and will be affirmed in the absence of an abuse of discretion. See *Bussell v. Bussell, supra*. A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Bussell v. Bussell, supra*.

On appeal, Kathy challenges the district court's valuation of John's interest in Tiburon. The record indicates that Tiburon is a limited liability company owned by John and one partner. With respect to our review of the district court's valuation of John's interest in this business, both parties cite us to similar propositions of law concerning the valuation of closely held corporations.

To determine the value of a closely held corporation, the trial court may consider the nature of the business, the corporation's fixed and liquid assets at the actual or book value, the corporation's net worth, marketability of shares, past earnings or losses, and future earning capacity. *Shuck v. Shuck*, 18 Neb. App. 867, 806 N.W.2d 580 (2011). The method of valuation used for a closely held corporation must have an acceptable basis in fact and principle. *Id.*

As noted above, a certified public accountant was the only expert to provide testimony about the value of John's interest in Tiburon. He testified about the various methods of valuation and specifically testified that the market approach, while often preferable, was not feasible in this

case because of the lack of comparable business that had been sold. He conducted valuations using both an asset approach and an income approach, and he rejected the negative valuation arrived at through the asset approach out of recognition that John's interest has value as a result of intangibles, goodwill, and business history. He also testified about how he arrived at the $96,945 valuation for John's interest through the income approach, and he testified that he conducted the valuation consistent with industry standards.

There was abundant evidence adduced by John concerning the performance of Tiburon, the impact of additional debt associated with the purchase of another company, and the economic downturn. There was evidence about the impact of losing large clients, of existing clients moving some accounts in house, and of other economic circumstances.

Kathy did not present any contrary expert testimony in this case. The only evidence she adduced to contradict the accountant's valuation was her own testimony and language in a buy-sell agreement executed in 2004. Kathy's opinion on the value of John's interest was solely based on language in the buy-sell agreement indicating that in 2004 John and his co-owner had entered an agreement providing for the sale of their respective shares of Tiburon to the other for $1.5 million. That agreement, however, also specifically included language providing that the valuation could be revised by the owners and that, in the event of an actual need to sell one owner's interest, if the valuation had not been reevaluated in the past 2 years then a revaluation was required. And the accountant provided the only testimony at trial concerning what such a revaluation would mean when he testified that revaluing the interest under the procedure outlined in the buy-sell agreement would result in a negative valuation.

Upon our de novo review of the record in this case, we do not find an abuse of discretion in the court's valuation of John's interest in Tiburon. Kathy's argument to the contrary is without merit.

### (c) Attorney Fees

Finally, Kathy challenges the district court's award of attorney fees. She argues that the court should have awarded her the entirety of her incurred fees. We find no merit to this assigned error.

In a marital dissolution action, an award of attorney fees depends on a variety of factors, including the amount of property and alimony awarded, the earning capacity of the parties, and the general equities of the situation. *Bussell v. Bussell*, 21 Neb. App. 280, 837 N.W.2d 840 (2013). An appellate court reviews such an award de novo on the record; however, the award of attorney fees is initially entrusted to the discretion of the trial court, whose decision will normally be affirmed in the absence of an abuse of that discretion. See *id.* A judicial abuse of discretion exists when the reasons or rulings of the trial judge are clearly untenable, unfairly depriving the litigant of a substantial right and denying just results in matters submitted for disposition. *Bussell v. Bussell, supra*.

In this case, Kathy adduced evidence indicating that she had accumulated approximately $19,000 in attorney fees. The court found the fees to be fair and reasonable and ordered John to pay $12,000 of them. In light of the evidence adduced concerning John's monthly cashflow and the projections for his future cashflow, the alimony award affirmed above, and the rest of the

record in this case, we cannot find such an award of fees to be an abuse of discretion. This assigned error is without merit.

## 2. JOHN'S CROSS-APPEAL

John challenges the district court's failure to award him a credit for mortgage payments that he is obligated to make until the parties' residence is sold. He argues that the decree includes no time limit for sale of the residence and that his obligation continues to increase until the residence is sold, making a credit for such payments equitable. We find no merit to this assertion.

As noted above, the ultimate test in determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of the case. See *Bussell v. Bussell, supra*. The trial court's decision, although reviewed de novo on the record, is normally affirmed absent an abuse of discretion. *Id.*

At trial, Kathy testified that she was asking for the marital residence to be sold. In the decree, the trial court ordered the house to be placed on the market within 30 days and to be sold and ordered John to continue making the mortgage payments until such time as the residence is sold. The court ordered the net proceeds or losses from the sale to be divided equally.

In light of the evidence in this case concerning the relative economic circumstances of the parties, we do not find an abuse of discretion in the court's order that John be responsible for the mortgage until the sale of the parties' marital residence. We find no merit to John's cross-appeal.

## V. CONCLUSION

We find no merit to Kathy's assertions on appeal. We find no merit to John's cross-appeal. We affirm the decree of the district court.

AFFIRMED.