Argued and submitted November 21, 2000, reversed and remanded in part;
otherwise affirmed October 31, 2001

In the Matter of the Marriage of

Terry F. WEAKLEY,
*Appellant - Cross-Respondent,*
*and*

Janet K. WEAKLEY,
*Respondent - Cross-Appellant.*

99DO-0133DS; A108764

33 P3d 1045

Inge D. Wells argued the cause for appellant - cross-respondent. With her on the briefs was Wells & Wells.

James C. Farrell argued the cause and filed the brief for respondent - cross-appellant.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

EDMONDS, P. J.

## EDMONDS, P. J.

Husband appeals from a dissolution judgment. ORS 107.105. He makes four assignments of error: The trial court erred (1) by adopting an expert witness's opinion as to the valuation of husband's stock in his business by including goodwill and by it failing to deduct for sales commissions in arriving at the value of equipment; (2) by failing to discount the shareholder loan owed by husband's company to him; (3) by failing to take into account in its property award wife's alleged refusal to provide discovery; and (4) by requiring him to pay an equalizing judgment within 120 days. Wife cross-appeals the trial court's denial of her claim for spousal support. On *de novo* review, we affirm on husband's appeal, and on wife's cross-appeal, we award her indefinite spousal support in the amount of $195 per month.

At the time of the dissolution, husband was 49 years old, and wife was 45 years old. They had been married for 26 years and have one adult child. Neither party brought any substantial assets to the marriage. Husband completed two and one half years of college before the marriage. Throughout most of the marriage, he was employed by a logging company. In 1996, he formed Cascade Thinning, Inc. (Cascade), a Subchapter S corporation, with two other shareholders. Husband works full time for Cascade. He runs a shovel and a log loader. He receives income of $3,550 per month, and his total monthly expenses are $2,861. At some point, husband elected to defer receipt of payment of a $500 per month raise. The company kept track of those amounts, and husband drew against them as needed for personal expenses, including the cost of this litigation. Consequently, husband has drawn an undetermined amount of money from Cascade to pay for personal and legal expenses and has exhausted the surplus created by his retained salary. Husband also receives work-related benefits from Cascade such as use of a truck, a cell phone, fuel related to business travel, dining and lodging expenses and health insurance.[1] He also receives $96 per month in veterans' disability benefits.

---

[1] One witness estimated that the value of those benefits ranges from $1,400 to $2,150 per month when husband is working away from home.

Cascade is a specialized logging company that performs thinning projects. It employs 11 people and has gross revenues of more than a million dollars. Fifty percent of the company's business comes from fixed contracts, and the rest results from bids. In the industry, 90 percent of thinning contracts are bid contracts, which means that the contracts will be let to the lowest qualified bidder, regardless of the bidder's reputation or experience. Husband describes the thinning business as "feast or famine," with too much business in the summer and too little business in the winter. The evidence shows overall that the timber industry is a declining industry because there is a multitude of competitors and a decreasing timber supply.

When forming Cascade, husband contributed the initial start-up capital, and the other two shareholders contributed their experience. The shareholders have entered into a stock transfer agreement. The agreement gives the company and the other shareholders the right to purchase a shareholder's stock before the stock can be sold to a third party. Any attempt by a shareholder to encumber the stock is treated as an election to transfer under the agreement. The agreement also provides that the other shareholders will acquire without cost a portion of husband's stock each year until the year 2003, at which time husband will own 40 percent of the stock and the two other shareholders will own 30 percent each. At the time of the dissolution, husband owned 56 percent of the stock in the corporation.

Wife is a high school graduate. She is employed full time as an optical assistant and works an average of four hours of overtime each month. She has no plans for further education or for a job change. She suffers from fibromyalgia, which requires that she take medication, but her disease does not prevent her from working. She earns approximately $1,849 a month, and she lists her monthly expenses as between $2,792 and $3,017. Those amounts include saving 15 percent of her salary for retirement and a $1,000-1,200 per month housing expense. During the marriage, Cascade paid for wife's medical insurance. After the dissolution, wife will be able to obtain medical insurance for $195 a month through her employer.

During the marriage, both parties put money into their respective IRA accounts; husband stopped making contributions three years ago when he started paying $609 a month in child support for a child conceived outside the marriage. Wife testified that the parties contemplated retiring when husband was age 47 years old and, through her management of their finances, she would have accomplished that goal, had she not "lost control" of the family finances. At the time of dissolution and after a 30 percent tax liability discount, husband had two IRA accounts in the amount of $38,470 and $63,300; while wife had an IRA account in the amount of $7,700, an investment account in the amount of $33,962 and a retirement account in the amount of $21,799. In 1977, the parties built a residence and, at the time of trial, husband continued to reside there. The parties stipulated that the value of the residence was $150,000. It is encumbered by a first mortgage of about $7,200 and a second mortgage of about $40,000 that Cascade has assumed. Husband requested that he receive the marital residence because his mother lives next door.

At trial, husband's expert witness, a certified public accountant, valued Cascade's net assets at $910,200. He did not include any goodwill in the calculation. He deducted from that value the cost of sales commissions, assuming that the equipment of the company would be sold. Husband's expert also deducted $16,696 from the net assets of the corporation as a discount on an unsecured shareholder's loan that husband had made to the corporation. Wife's expert witness, who is a certified public accountant and a certified valuation expert, also testified as to the value of husband's interest in Cascade. He based his value on the fair market value of the equipment without a discount for sales commissions. He also included in his valuation a $117,018 value for goodwill, explaining that, in his view, Cascade is an ongoing concern that is not dependent on any particular expertise of husband. He also took into account the declining nature of the logging industry, Cascade's four-year business history, and the specialized nature of its business in his valuation of Cascade's goodwill. Wife's expert did not discount the loan.

The trial court awarded each party their individual retirement, checking, savings, and investment accounts. It

found that husband was capable of earning $62,000 a year, even though he was not currently earning that much. Husband was also awarded the marital home and his interest in Cascade. This award left husband with net assets of $525,510 and wife with net assets of $99,461, according to the court's calculation. As a result, it awarded wife a $213,024.50 equalizing judgment, leaving each party with $312,485.50 in net assets. The judgment requires that husband pay the equalizing judgment within 120 days after entry of the judgment.

■ The trial court ruled that wife's expert witness's analysis is the preferred approach for the valuation of Cascade. We agree. As to husband's argument on appeal that the value of Cascade should be discounted because of sales commissions for the sale of equipment, we are not persuaded by the evidence that a prospective purchaser of Cascade's stock would necessarily deduct sales commissions from the value of each asset. Such a deduction would seem to be more appropriate if the assets were liquidated separately, as distinguished from the purchase of the business as a whole. As to the second assignment of error, the $92,000 loan that husband made to Cascade for start-up capital appears to be a bona fide debt. In fact, credits against the amount owed have been made for monies drawn by husband for litigation expenses. In addition, the amount of any discount would necessarily have to be speculative, based on the record before us. As to the third and fourth assignments, we do not find any place in the record where those issues were addressed in the trial court. In fact, neither party presented the court with a plan that addressed how and when the equalizing judgment should be paid. Consequently, we decline to review those assignments of error, and turn to husband's remaining argument regarding the inclusion of goodwill in the valuation of Cascade by wife's expert.

■ A business ordinarily has some value above the value of its assets, known as its goodwill value. *See Hinrichs and Hinrichs*, 37 Or App 833, 588 P2d 130 (1978). The "goodwill" of a business is commonly understood as the

"favor or advantage in the way of custom that a business has acquired beyond the mere value of what it sells whether due to the personality of those conducting it, the nature of

its location, its reputation for skill or promptitude or any other circumstance incidental to the business and tending to make it permanent." *Webster's Third New Int'l Dictionary*, 979 (unabridged ed 1993).

Thus, when the success or failure of a business depends on one party's personal services, we have tended not to assign a goodwill value to the business. *See, e.g., Lankford and Lankford*, 79 Or App 742, 745, 720 P2d 407 (1986). In *Lankford*, the husband was the sole owner of a logging operation, and he presented evidence that his operation was dependent on his special expertise and ability to negotiate contracts. Thus, the business had no ongoing value, apart from its assets, in his absence. Husband contends that his situation is similar to the situation in *Lankford*. He says that Cascade has no goodwill value because any competitor could acquire the same equipment that Cascade has and bid the same jobs.

■  There are at least two facts that diminish the weight of husband's argument. Husband is not the sole shareholder or representative of Cascade. Also, 50 percent of Cascade's business is from fixed contracts, contrary to the norm in the industry where 90 percent of business usually comes from bid contracts. In addition, there is no evidence in the record that Cascade's business is dependent on husband's personality or reputation. Wife's expert witness testified that the method that he used to determine goodwill was a conservative approach and a method widely used. Although husband's expert witness questioned whether Cascade had any goodwill, he did not testify about personality or reputation factors specific to Cascade's business that would support husband's position. When all of the evidence is considered, we are persuaded by a preponderance of the evidence that Cascade has a goodwill value as testified to by wife's expert witness. Consequently, we agree with the trial court's evaluation of husband's interest in Cascade. Wife cross-appeals the trial court's denial of her request for $750 per month in indefinite spousal support. The general policy goals for spousal support are to achieve the economic self-sufficiency of each spouse pursuant to the statute and to remedy any disparity in earning ability because of the effects of the marriage. *Lemke and Lemke*, 289 Or 145, 148, 611 P2d 295 (1980). ORS 107.105(1)(d) (1997),

the statute governing the decision in this case, provided that a court should consider the following factors when awarding spousal support:

"(A)  The length of the marriage;

"(B)  The age and the physical and mental health of the parties;

"(C)  The contribution by one spouse to the education, training, and earning power of the other spouse;

"(D)  The earning capacity of each party, including educational background, training, employment skills and work experience;

"(E)  The need for education, training or retraining to enable a party to become employable at suitable work or to enable the party to pursue career objectives to become self-supporting at a standard of living not overly disproportionate to that enjoyed during the marriage to the extent that is possible;

"(F)  The extent to which the present and future earning capacity of a party is impaired due to the party's extended absence from the job market to perform the role of homemaker, the extent to which suitable job opportunities are unavailable to a party considering the age of the party and the length of time reasonably anticipated for a party to obtain training or updating of career or job skills. * * *

"* * * * *

"(I)  The amount of long-term financial obligation, including legal fees and costs;

"(J)  Costs of health care to a party;

"(K)  The standard of living established during the marriage;

"* * * * *

"(M)  Such other matters as the court shall deem relevant in the particular case in order that each party shall have the opportunity to achieve an economic standard of living not overly disproportionate to that enjoyed during the marriage, to the extent that is possible."

The most significant consideration, usually, is whether the earning ability of the spouse asking for support can provide a

standard of living not overly disproportionate to what he or she enjoyed during the marriage. *Grove and Grove*, 280 Or 341, 571 P2d 477, *mod* 280 Or 769, 572 P2d 1320 (1977).

■    In this case, the parties' marriage lasted 26 years. Neither party contributed to the other's education or brought substantial assets into the marriage. Wife was 45 years old at the time of trial. Her health problems do not prevent her from working fulltime. Husband was 49 years old at the time of trial and also works fulltime. Wife has worked at her current job for years and has no plans to change. However, she argues that she needs spousal support because, without it, she will be unable to purchase a house or save for retirement, as she did during the marriage. She also points out that she now has the additional expense of medical insurance. When her medical insurance is included, wife's projected monthly expenses increase to between $2,987 and $3,212 per month. When wife receives payment of the equalizing judgment, her expenses should diminish, and she should be able to purchase a residence. Her salary of $1,849 will therefore provide for many of her remaining expenses, including the amount that she saves for retirement. However, her employment benefits do not cover the cost of her medical insurance, which, under ORS 107.105(1)(d)(K) (1997) is an appropriate reason to award spousal support.

We find that husband has the ability to pay for wife's medical insurance expenses. ORS 107.105(1)(d)(D) (1997). His present salary is at least $4,050 per month, and he receives other benefits from Cascade.[2] Given the length of this marriage, it is not unreasonable to place the parties in relative parity, insofar as their standard of living is concerned. That objective may require husband to curtail his expenses accordingly. Although he has recently incurred a child support obligation, that obligation does not detract from the previous obligation that the law imposes on him to contribute to a standard of living not overly disproportionate to what he and wife enjoyed during the marriage. The trial

---

[2] The trial court found:

"Although Mr. Weakley['s] earnings are currently less than the $62,000 he has earned in the past, the court finds he is capable of earning that sum in addition to the considerable benefits presented by the corporation."

court was concerned that husband would not have the ability to pay spousal support, the judgment, his child support obligation and still support himself. However, unlike wife, husband has the benefit of the earning potential of Cascade and is the party who has the most ability to furnish a necessity like health insurance. Under the circumstances of the parties' marriage, we conclude that it is just and equitable that he bear the post-marriage burden of providing wife with the cost of health insurance, a benefit that she enjoyed during the marriage.

Reversed and remanded for entry of judgment awarding wife indefinite spousal support in the amount of $195 per month beginning 30 days after date of original judgment; otherwise affirmed.