Argued and submitted October 12, 2009, vacated and remanded for reconsideration of property division; otherwise affirmed December 29, 2010, petition for review denied May 26, 2011 (350 Or 408)

In the Matter of the Marriage of

Shelly A. SLATER,
*Petitioner-Respondent,*

*and*

Paul J. SLATER,
*Respondent-Appellant.*

Crook County Circuit Court
06DS0016; A137465

245 P3d 676

Mark Johnson argued the cause for appellant. With him on the briefs was Johnson & Lechman-Su PC.

Kristin M. Larson argued the cause for respondent. With her on the brief was Stahancyk, Kent, Johnson & Hook, P.C.

Before Haselton, Presiding Judge, and Brewer, Chief Judge, and Armstrong, Judge.*

HASELTON, P. J.

---

* Brewer, C. J., *vice* Rosenblum, J.

## HASELTON, P. J.

Husband appeals from a dissolution judgment, raising three assignments of error. Specifically, husband challenges: (1) the amount and duration of the award of spousal support to wife; (2) the trial court's valuation of husband's chiropractic business; and (3) the court's allocation of a tax liability to husband. We reject husband's first and third assignments of error without discussion and write only to address the second assignment, pertaining to the valuation of husband's business. As amplified below, we conclude that the trial court erred in adopting a valuation of husband's chiropractic business that was predicated on the assumption that husband would execute a noncompetition covenant. Accordingly, we remand with instructions for the trial court to modify the judgment with respect to the property division but otherwise affirm.

Although we review *de novo*,[1] many of the facts material to our review are undisputed. The parties were married in 1990, and, at the time of the dissolution, in 2007, husband was 38 and wife was 40. The couple had four children, ages 15, 13, 5, and 3. Wife has not worked outside the home since graduating from college in 1993.

Husband is the owner of a very successful chiropractic business in Prineville, Paul J. Slater, DC, PC, dba Slater Chiropractic, which is organized as an S corporation. Husband purchased the business in 1996 for $157,500, which included payments of $37,000 for goodwill and the previous owner's patient list and another $75,000 for the previous owner's execution of a noncompetition covenant.

In 2001, Slater Chiropractic generated $446,367 in revenue, which thereafter increased every year to $633,536 in revenue in 2006. The revenues from Slater Chiropractic are substantially above the national average for chiropractic offices, which is less than $250,000 annually. In 2006,

---

[1] The notice of appeal in this case was filed before June 4, 2009; accordingly, the 2009 amendments to ORS 19.415(3) (which give the appellate court discretion as to whether it reviews facts *de novo* in most equity cases) do not apply, and our standard of review is governed by the 2007 version of the statute. *See* Or Laws 2009, ch 231, § 3.

husband's gross income from Slater Chiropractic was approximately $25,000 a month. However, a short time before trial, husband underwent back surgery and was expected to be in recovery and unable to work for three to six months. Husband had written a letter to his patients encouraging them to seek treatment from an employee associate chiropractor, Dr. Miller, in his absence.

About 60 percent of Slater Chiropractic's business comes through insurance, including husband's contract as a "preferred provider" with a health insurance company that covers local government employees. Slater Chiropractic also attracts business through word-of-mouth, referrals, and by advertising in the Yellow Pages. Husband, through Slater Chiropractic, is also actively engaged in the Prineville community, and wife contributed to that involvement during their marriage.

Slater Chiropractic employs a receptionist, three chiropractic assistants, and, since 2006, the associate chiropractor, Miller. As part of his employment agreement, Miller executed a noncompetition covenant with Slater Chiropractic for five years. Husband, in contrast, does not work under an employment contract with Slater Chiropractic and has not entered into a noncompetition covenant with the business. Husband testified that he "plan[s] to work in the chiropractic profession in Prineville until I retire" and that, were he to sell his practice "at [his] current stage of life," he would "[a]bsolutely" refuse to enter into such a covenant.

At trial, two experts testified as to the value of Slater Chiropractic. Wife's expert, Svendsen, used two methods to estimate the fair market value of Slater Chiropractic—the capitalization of earnings approach and the capitalization of excess earnings approach—both of which valued the tangible (such as equipment) and intangible (such as client files and goodwill) assets of the business. He then averaged the resulting values from those two methods to reach a final, estimated fair market value of $610,000.[2]

---

[2] In its letter opinion, the trial court found that wife's expert had attributed a value of $570,000 to Slater Chiropractic, which was wife's expert's valuation of Slater Chiropractic as of December 31, 2005. However, wife's expert updated his valuation for Slater Chiropractic in advance of trial to reflect its value as of December 31, 2006, and relied on those updated figures in his testimony.

Husband's expert, Holmer, used four methods to value Slater Chiropractic. The first, the adjusted book value approach, valued the net tangible assets of Slater Chiropractic but not its intangible assets, including goodwill value. Pursuant to that method, husband's expert concluded that the fair market value of Slater Chiropractic's net tangible assets was $200,422. Husband's expert relied on three other valuation methods, *viz.*, the capitalization of earnings approach and capitalization of excess earnings approach—which both take into account the tangible and intangible assets of a business—and the comparable transaction approach, which relied in part on a separate expert's appraisal of the intangible asset value of Slater Chiropractic, to reach a composite, total fair market value for Slater Chiropractic of $504,152.

Both experts agreed that Slater Chiropractic has goodwill, *i.e.*, some value above the value of its net tangible assets, but disagreed as to whether, or to what extent, that added value should be characterized as "entity goodwill," *i.e.*, goodwill attributable to the business, or "personal goodwill," *i.e.*, goodwill attributable to husband individually.[3] Wife's expert did not explicitly identify in his appraisal what part of Slater Chiropractic's total value was attributable to goodwill. However, he did testify that that amount could be calculated simply by deducting the net tangible assets of Slater Chiropractic (which he valued at $160,902) from his estimated fair market value of $610,000, yielding a total goodwill value of $449,098.[4] Wife's expert further testified that he believed that *all* of Slater Chiropractic's goodwill was attributable to the business—and that *none* of that goodwill was "personal goodwill on behalf of Dr. Slater[.]" Given that testimony, wife argued that "Slater Chiropractic is a business that is independent of Husband's efforts" and, as such, that its goodwill value should be characterized as "entity goodwill."

---

[3] We address the content of those amorphous terms below. *See* 240 Or App at 37-42.

[4] That calculation is based on wife's expert's valuation as of December 31, 2006. *See* 240 Or App at 33-34 n 2.

Conversely, husband presented evidence that the value of Slater Chiropractic's goodwill was $303,730.[5] Husband's expert further determined that 10 percent of that goodwill value ($30,373), based on the percentage of collected revenues, was attributable to Miller's practice and that the balance of the goodwill, $273,357, was attributable to the "ongoing personal services of husband." Because Miller was an employee and had entered into a noncompetition covenant, husband's expert determined that the value of Miller's goodwill was properly included as an asset of the business. However, in the expert's view, the goodwill attributable to husband individually was not properly considered a business asset. Accordingly, in husband's view, for purposes of dissolution, the total value of the chiropractic business was $230,795, *i.e.*, $504,152 minus $273,357.

Related to their disagreement as to whether goodwill was predominately or entirely a business asset of Slater Chiropractic or was personal to husband, husband and wife also disagreed about whether it was proper when valuing the business to assume that husband would execute a noncompetition covenant. Both experts agreed that, if husband were to sell his practice, it would be necessary for him to enter into such an agreement. Wife's expert testified that, because a noncompetition covenant would be required at the time of sale, it was proper to include the value of such a covenant in calculating the fair market value of the business. Consistently with that premise, wife did not present evidence specifying how much of the intangible asset value in Slater Chiropractic would be assignable to a hypothetical noncompetition covenant. However, wife's expert did testify that, if Slater Chiropractic were sold without a noncompetition covenant binding husband, the business would be valued at less than $610,000 because of the risk that the new owner would receive the net tangible asset value of the business but (with husband as a viable competitor) "would lose the revenue stream that should go along with it"—and, in that event, its

---

[5] Husband's expert reached that figure by subtracting the fair market value of the net tangible assets, *i.e.*, the adjusted book value of the business or $200,422, from the composite value he calculated using capitalization of earnings, capitalization of excess earnings, and comparable transaction approaches, *viz.*, $504,152.

net asset value ($160,902) "would be a floor" for that valuation.

Husband countered that it was not proper, when valuing a business for purposes of calculating a property distribution at divorce, to include the value of a putative noncompetition covenant because he had no intention to retire, change careers, or sell his business. In husband's view, the assumption that he would execute a noncompetition covenant "constitutes [a] taking of his post-divorce income," which is separate nonmarital property, in order to enhance the value of the property divided at the time of the divorce.[6] Further, according to husband, the value of such a hypothetical covenant corresponds to the value of the goodwill "personal" to husband, *i.e.*, $273,357. Accordingly, husband contended that the proper value of Slater Chiropractic was $230,795—*viz.*, the total value of the business (including the goodwill related to Miller's practice), $504,152, minus the value of the putative noncompetition covenant binding husband.

During closing arguments before the trial court, wife and husband defended the methodologies their respective experts employed in valuing Slater Chiropractic—and, especially, as relevant here, took issue with the other's treatment of goodwill value, particularly with respect to the value of the putative noncompetition covenant.

The trial court ultimately valued Slater Chiropractic at $500,000, which included the value of the business's net tangible assets and its goodwill value, assuming the execution of a noncompetition covenant. The trial court explained that, although "there is no indication that [husband] has any intention of selling the business, I have no doubt that if he were[,] the value of $500,000 would be a fair and reasonable asking price." The trial court further observed that, although Oregon appellate courts have yet to rule on the issue of whether the value of a putative noncompetition covenant is cognizable as a component of goodwill in valuing a business

---

[6] In so asserting, husband invoked *Stewart v. Stewart*, 152 P3d 544, 554 (Idaho 2007) (Eismann, J., dissenting in part).

for the purposes of the property division in a marital disso-
lution, "goodwill is more than the value of a covenant not to
compete." In that regard, the trial court noted that at least
some of the goodwill value in Slater Chiropractic was attrib-
utable to husband's active involvement in the community,
which was made possible, at least in part, by wife's efforts.
Based in part on its valuation of Slater Chiropractic, the trial
court awarded wife an "offsetting judgment" of $78,524.[7]

■     On appeal, the parties generally reprise the argu-
ments they made before the trial court. On *de novo* review,
we agree with husband that the trial court erred in predicat-
ing its valuation of the business—and, particularly, its good-
will—on the assumption that husband would execute a non-
competition covenant. Accordingly, as explained below, we
remand with instructions for the trial court to modify the
property division.

■     At the outset, it is essential to define the content of
some predicate terms, including, especially, the meaning of
"goodwill"—a concept of chameleon capability. Our cases
have generally defined "goodwill" to mean the value of a busi-
ness "over and above the value of its assets." *Maxwell and
Maxwell*, 128 Or App 565, 568, 876 P2d 811 (1994). *See also,
e.g., Weakley and Weakley*, 177 Or App 363, 368, 33 P3d 1045
(2001); *Adams and Adams*, 121 Or App 187, 190, 854 P2d 501
(1993); *Goger and Goger*, 27 Or App 729, 732, 557 P2d 46
(1976). "Goodwill" is commonly understood to refer to the

---

[7] Specifically, the trial court calculated the offsetting judgment as follows:

**"Ms. Slater**

| | |
|---|---|
| "Equity in marital home: | $396,200 |
| "[Investment Account]: | 93,511 |
| "Retirement Account less taxes: | 237,891 |
| "Subtotal | $727,602 |
| "Offsetting Judgment: | 78,524 |
| "TOTAL | $806,126 |

**"Mr. Slater**

| | |
|---|---|
| "Equity in [building]: | $384,649 |
| "Slater Chiropractic: | 500,000 |
| "Subtotal | $884,649 |
| "Offsetting Judgment: | ( 78,524) |
| "TOTAL | $806,125" |

(Boldface in original.)

" 'favor or advantage in the way of custom that a business has acquired beyond the mere value of what it sells whether due to the personality of those conducting it, the nature of its location, its reputation for skill or promptitude or any other circumstance incidental to the business and tending to make it permanent.' *Webster's Third New Int'l Dictionary*, 979 (unabridged ed 1993)."

*Weakley*, 177 Or App at 368-69. *See also McDuffy and McDuffy*, 184 Or App 359, 365, 56 P3d 449 (2002) (quoting *Weakley*); *Huang v. Department of Revenue*, TC 4880, WL 2217751 at *3 (July 27, 2009) (defining goodwill as "the value of a business above the value of its physical assets"; "[t]hat value is attributable to such factors as expected profits, business location, reputation for good service, and other qualities that make the business attractive to individuals seeking its services"). In sum, "goodwill" generally refers to those intangible assets of a business, such as its relationships with suppliers, customers, and employees, as well as its location, name recognition, and reputation, that engender customer loyalty regardless of who works there. *See generally* Christopher A. Tiso, *Present Positions on Professional Goodwill: More Focus or Simply More Hocus Pocus?*, 20 J Am Acad Matrimonial L 51, 52 (2006). That definition generally comports with well-accepted accounting and economic understandings of the term. *See* Allen Parkman, *The Treatment of Professional Goodwill in Divorce Proceedings*, 18 Fam LQ 213, 213-15 (1984).

The matter becomes less simple, and more confusing, when the term "goodwill" is qualified by reference to the purported source of a business's enhanced value beyond the value of its physical assets. In particular, complication and potential misunderstanding arise from reference to "business goodwill" and "personal goodwill." The former is, in fact, functionally the same as simple "goodwill" as defined above—that is, it connotes enhanced value attributable to factors related to, or inhering in, the *entity*.[8] The latter connotes the

[8] Various other names for the same concept include: "corporate goodwill," *see, e.g., McReath v. McReath*, 789 NW2d 89, 90 (Wis Ct App 2010); "institutional goodwill," *see, e.g., Smith and Smith*, 168 Or App 349, 356, 7 P3d 559 (2000); and "enterprise goodwill," *see, e.g., Gilman v. Hohman*, 725 NE2d 425, 429 (Ind Ct App), *transfer den*, 735 NE2d 237 (Ind 2000). When discussing the entity-based goodwill

increased earning capacity of a business attributable to an *individual's* (often, the principal's) skills, efforts, personality, or reputation.[9]

The semantic and analytic confusion is especially marked—both in our case law and in the case law of our sister states—when it comes to assessing the goodwill of a professional practice or a closely held business or corporation, specifically in determining whether a principal owner's individual skills and qualities are properly included in that valuation. *Compare Lankford and Lankford*, 79 Or App 742, 746, 720 P2d 407 (1986) (holding that there was no goodwill in closely held corporation where "the success or failure of the business depend[ed] on husband's personal services and his ability to negotiate contracts"), *with Reiling and Reiling*, 66 Or App 284, 288, 673 P2d 1360 (1983), *rev den*, 296 Or 536 (1984) (listing factors important for determining goodwill as "health, professional reputation, skill, knowledge, work habits[,] and the nature and duration of [the business]"); *see also McReath v. McReath*, 789 NW2d 89, 90 (Wis Ct App 2010) (observing that this area of law "has been hotly debated in jurisdictions across the county for at least thirty years" (internal quotation marks omitted)).

■     Nevertheless, aside from some slippage at the margins, our cases, like those of the majority of courts that have considered the issue, *see* Tiso, 20 J Am Acad Matrimonial L at 57-59 (describing case law), have generally distinguished between the intangible income-producing assets of a business —that is, its "goodwill"—from the value that inheres to the personal traits of that business's employees or owners.

---

of a professional practice, such as a medical or dental practice, some courts and commentators use the term "professional goodwill." *See, e.g., Walton v. Walton*, 657 So 2d 1214, 1216 (Fla 4th Dist Ct App 1995) (distinguishing "professional goodwill attributable to the business" from the "personal reputation" of the professional); Helga White, Comment, *Professional Goodwill: Is It a Settled Question or Is There "Value" in Discussing It?*, 15 J Am Acad Matrimonial L 495 (1998).

[9] To further confuse matters, in the case of a professional practice, some courts and commentators use the term "professional goodwill" to refer not to the practice's entity-based goodwill, *see* 240 Or App at 38-39, but, instead, to the practice's enhanced earning capacity attributable to the principal/professional's skills, efforts, personality, or reputation. *See, e.g., McReath*, 789 NW2d at 90 (distinguishing "corporate goodwill" from "professional goodwill").

Indeed, the import of those decisions is that "personal good-will" is not, in fact, "goodwill" for purposes of valuation in the marital dissolution context. Our decisions in *Lankford*, *Maxwell*, *McDuffy*, and *Weakley* are illustrative.

*Lankford* involved the valuation of a logging business of which the husband was sole owner. 79 Or App at 744. The wife contended that, as a going concern, the business had a value of roughly $224,000. *Id.* at 745. Conversely, the husband presented evidence that the business had no value aside from the value of the equipment and that "there was generally no goodwill in such an operation unless the owner personally promised his services to accompany the sale of the business." *Id.* Further testimony clarified that, with respect to a logging operation, the goodwill "wouldn't be worth, really anything because, * * * [t]he good job that another operator has done wouldn't necessarily reflect that [a new owner] would do the same job." *Id.* (internal quotation marks omitted). The trial court ultimately valued the business at $90,000. *Id.*

On appeal, the wife reiterated that the husband's logging business should be valued as a "going concern" and, thus, that the trial court erred in failing to account for the business's goodwill. *Id.* We disagreed and held that, because the evidence on *de novo* review established "that the success or failure of the business depends on [the] husband's personal services and his ability to negotiate contracts in a fluctuating and depressed market," the trial court correctly determined the value of the business. *Id.* at 746.

We reached similar conclusions in *Maxwell* and *McDuffy*. In *Maxwell*, we held that the trial court erred in assigning a goodwill value to the husband's business, a sole proprietorship, where the evidence established that the business's success was "completely dependent on [the husband's] creative, personal services." 128 Or App at 569. Similarly, in *McDuffy*, we sustained the trial court's determination that there was no goodwill in the trucking company awarded to the husband, where the parties had agreed before the trial court that there was no goodwill and the evidence established that the husband ran the business by himself, there were no steady customers, and "if husband left the business, there

would be nothing left to the trucking company other than the assets." 184 Or App at 362-63, 365.

In contrast, in *Weakley*, we determined that the trial court correctly rejected the husband's argument that there was no goodwill value in the specialized logging company of which he was part owner. 177 Or App at 369. Central to that determination was evidence that the husband was not the sole shareholder or representative of the logging business and that 50 percent of the company's business came from fixed contracts, as opposed to bid contracts that go "to the lowest qualified bidder, regardless of the bidder's reputation or experience." *Id.* at 366. Additionally, and significantly, there was "no evidence in the record that [the company's] business [was] dependent on husband's personality or reputation." *Id.* at 369. Thus, although the husband's expert testified that he believed that there was no goodwill in the business, the husband failed to present evidence that would substantiate that opinion. *Id.*; *see also Adams*, 121 Or App at 190-91 (upholding trial court's finding that corporations, which relied substantially on the husband's personal services for their profitability, had goodwill value).

Taken together, our cases demonstrate that, for purposes of valuation in this context, cognizable "goodwill" refers to the value of a business "over and above the value of its assets" irrespective of the owner's or professional's continued "personal services," *Lankford*, 79 Or App at 746, or "personality or reputation," *Weakley*, 177 Or App at 369. Accordingly, where a business has no value above and beyond its assets absent "the owner personally promis[ing] his [or her] services to accompany the sale of the business," *Lankford*, 79 Or App at 745, there is no goodwill. *See also McDuffy*, 184 Or App at 363, 365. At the same time, a closely held business may have goodwill value where the "success or failure," *Lankford*, 79 Or App at 746, of that business does not rest entirely on the business owner's personal services, personality, or reputation. *See Weakley*, 177 Or App at 369.

That understanding comports with the view of the majority of state courts, many of which have reasoned that it is improper to treat an individual principal's or professional's reputation as "goodwill" or as a divisible marital asset

because it is indistinguishable from that individual's probable future earning capacity. In other words, to the extent that the enhanced earnings of a closely held business or professional practice are due to an individual's skills, qualities, reputation, or continued presence, those earnings are attributable to the individual, not to the business entity. *See, e.g., Held v. Held*, 912 So 2d 637, 639 (Fla 4th Dist Ct App 2005), *rev den*, 928 So 2d 335 (Fla 2006) (discussing Florida cases holding that "personal goodwill represented a person's probable future earning capacity"); *Jay Myoung Yoon v. Sunsook Yoon*, 711 NE2d 1265, 1269 (Ind 1999) (adopting the view that " 'personal goodwill' represents nothing more than the future earning capacity of the individual and is not divisible"); *Gaskill v. Robbins*, 282 SW3d 306, 314 (Ky 2009) (following *Yoon*).

Against that comprehensive backdrop, we return to the precise question presented here: Did the trial court err in premising the value of husband's chiropractic business on the assumption that husband would be bound by a noncompetition covenant? Although no Oregon appellate decision has addressed that question, courts in other jurisdictions have. Among those courts, there is a split of authority, with most having concluded that, to the extent that a noncompetition covenant corresponds to the business's future earning capacity attributable to an individual's skills, qualities, reputation, or continued presence, the value of that covenant is not cognizable in a marital property division. *See, e.g., Kricsfeld v. Kricsfeld*, 8 Neb App 1, 18, 588 NW2d 210, 221 (1999) (canvassing case law); *Marriage of Monaghan*, 78 Wash App 918, 927, 899 P2d 841, 846 (1995) (same); *but see McReath*, 789 NW2d at 100 (holding that salable professional goodwill represented by a noncompetition covenant is a marital asset).

We agree with the majority approach. When executed incident to a sale of a business, a noncompetition covenant ensures that the former business owner will not take any customers or patients with him or her and will not compete against the new business owner in the same general area for a reasonable period of time. The value of that covenant depends, at least in part, on the ability of the covenantor to attract future business based on his or her personal services and personality or reputation, separate and apart from

his or her association with the business. As the Nebraska Court of Appeals explained:

> "The reasoning of the courts which have excluded covenants not to compete from the value of a professional practice are persuasive and consistent with the rationale * * * that any 'asset' that does not have a value independent of the presence or reputation of a particular individual is not a marital asset. * * * [T]he value of a typical covenant prohibiting or restricting an individual from competing with another is, by definition, dependent upon the presence or reputation of the individual who gives the covenant. For example, if an individual loses his or her license to practice medicine, he or she ceases to be 'present' in a competitive sense. Consequently, it is unlikely that any value would be paid to that person for a covenant not to compete, as he or she could not compete anyway. To the extent that the value of a covenant not to compete is solely dependent on the presence or reputation of an individual, it is not a marital asset."

*Kricsfeld*, 8 Neb App at 18-19, 588 NW2d at 221-22.

Thus, the same rationale that warrants exclusion of enhanced earnings uniquely referable to an individual's or principal's skills, qualities, reputation, or continued presence from the calculation of a business's goodwill, *see, e.g.*, *McDuffy*, 184 Or App at 363, 365; *Maxwell*, 128 Or App at 569; *Lankford*, 79 Or App at 746, also pertains to the treatment of the value of a putative noncompetition covenant. Both correspond, at least broadly, to a component of earnings attributable to the individual, and not the entity, that the business would lose if the individual withdrew from the business and, especially, opted to compete. In this context, each is a function of the individual's earning capacity, with the value of the noncompetition covenant corresponding to the present value of the forgone stream of future earnings.

The consequence of the foregoing is that the valuation of Slater Chiropractic as a marital asset could not properly be predicated on an assumption that, at the time of a putative sale, husband would be bound by a noncompetition covenant, thus enhancing the value of the business. Or, stated conversely, any valuation of Slater Chiropractic so predicated must concomitantly be reduced by the value of the

putative noncompetition covenant, corresponding to the value of enhanced earnings above the business's tangible assets, which are attributable to husband's individual skills, qualities, reputation, or continuing presence.

Here, wife made no attempt to present a valuation of the business differentiating between enhanced earnings attributable to the entity and enhanced earnings attributable to husband individually. Rather, wife's expert testified that *none* of the enhanced value of Slater Chiropractic was attributable to husband personally and that all of the business's value over and above its assets was divisible goodwill. Nonetheless, however, wife's expert agreed that, if husband were to sell his business, it would be necessary for him to execute a noncompetition covenant. That acknowledgement is irreconcilable with the position that husband's personal skills, services, and continued presence are immaterial to the business's enhanced earnings. If that were so, the assumption of a noncompetition covenant would be inapposite to valuation.

██ ██ To be sure, the evidence establishes that Slater Chiropractic has *some* goodwill—*viz.*, that attributable to Miller's practice. Nevertheless, the evidence substantiates husband's position that the goodwill inhering to Slater Chiropractic as an entity is minimal.[10] Husband is the sole shareholder of Slater Chiropractic, and he named the business after himself. Over half of Slater Chiropractic's business comes from husband's status as a preferred provider, and there is no evidence that that status can be transferred to the business or to a new owner. Finally, although in no way determinative of the value of Slater Chiropractic's goodwill in 2006, we note that when husband purchased the business in

[10] It bears reiteration that both parties' expert witnesses employed, in part, a capitalized excess earnings formula in their respective valuations. However, there is no evidence that Slater Chiropractic had any excess earnings, apart from revenues attributable to Miller's practice, that were not attributable to husband's skills, qualities, reputation, or continued presence. Thus, that valuation formula did not, itself, justify a finding that Slater Chiropractic had goodwill value apart from any excess earnings attributable to Miller. *See Maxwell*, 128 Or App at 568-69 (holding that, where an expert's calculation of the goodwill value of a spouse's business is based on a capitalization of excess earnings theory, and the evidence shows that the success of the business is completely dependent on the creative, personal services that the owner spouse provides, the business has no goodwill value).

an arm's-length transaction 10 years earlier, his payment for his predecessor's noncompetition covenant was substantially more than his payment for the business goodwill.

Given those factors, on *de novo* review, we adopt as reasonable husband's expert's calculation that $273,357 of the value in the business was "personal" to husband. We further adopt husband's expert's total valuation of $504,152. That, in turn, after deduction of that component attributable to husband personally, yields an asset value, for purposes of marital property division, of $230,795—and not $500,000, as determined by the trial court.

In sum, we hold that the trial court erred in including the value of a hypothetical noncompetition covenant when it valued Slater Chiropractic and, consequently, erred in determining the value of the business. The difference between the trial court's valuation of the business ($500,000) and our valuation on *de novo* review ($230,795) is $269,205. That difference requires a substantial reconfiguration of the trial court's property division beyond a simple elimination of the equalizing judgment ($78,524) in wife's favor. We remand for the trial court to determine a proper division consistently with this opinion.

Vacated and remanded for reconsideration of property division; otherwise affirmed.